# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**WESLEY TIMOTHY FULLARD,**

      **Plaintiff,**

**vs.**                            **Case No. 4:16cv507-MW/CAS**

**MARIA THOMAS, R.N.,
and CARRIE RHODES, L.P.N.,**

      **Defendants.**

_____/

## THIRD REPORT AND RECOMMENDATION[1]

Pending in this case are several motions: Defendants' motion for summary judgment, ECF No. 77, and the pro se Plaintiff's letter to the Court, ECF No. 87, which the Clerk's Office filed as a motion for urgent medical attention. Both are addressed in this Report and Recommendation.

---

[1] The first Report and Recommendation entered in this case, ECF No. 33, which was adopted, ECF No. 40, recommended dismissing Corizon Health Services, Inc. The second Report and Recommendation, ECF No. 61, recommended dismissing Defendants Mesa and Pliskin. That recommendation was also granted, ECF No. 63, and this case has proceeded against the remaining two Defendants.

Plaintiff was advised of his obligation to respond to the motion for summary judgment filed by Defendants Thomas and Rhodes, ECF No. 79, and Plaintiff filed a timely response in opposition, ECF No. 81.  Thereafter, Defendants filed a reply to his response, ECF No. 82, and Plaintiff filed a sur-reply, ECF No. 83.  Defendants then filed a motion to strike Plaintiff's sur-reply.  ECF No. 84.  That motion was denied, ECF No. 86, based on Defendants argument that Plaintiff's filing was not authorized and should be stricken.  However, Defendants were given an opportunity to file a sur-reply to Plaintiff's sur-reply if they desired to do so.  ECF No. 86.  Nothing further has been filed, and the motions are ready for a ruling.

**Allegations of the amended complaint, ECF No. 12**

Plaintiff's amended complaint [hereinafter after "complaint"] was sworn under penalty of perjury and declares that on August 8, 2014, at approximately 7 p.m. while Plaintiff was housed at Jefferson Correctional Institution, he "started having chest pain and shortness of breath." *Id.* at 5. Because Plaintiff had four prior heart attacks, he "took a 'nitro' pill" which had been given to him by the medical department.  *Id.*  Plaintiff told a dormitory officer that he believed he "was having a heart attack, and he was sent to medical with security."  *Id.* at 7.  Plaintiff was put in a treatment

Case No. 4:16cv507-MW/CAS

room around 7:30 p.m. and Defendants Thomas and Rhodes hooked him up to the E.K.G. machine.  *Id.*  Defendants Thomas and Rhodes repeatedly tried to "get the E.K.G. machine to work" but were unsuccessful.  *Id.*  In their agitation, they told Plaintiff "he was probably just having gas pain" and gave him Maalox.  *Id.*  Plaintiff tried to tell them he "was sure he was having a heart attack" because he had four prior heart attacks, but it "fell on deaf ears."  *Id.*  Plaintiff alleges they "tried for hours" to get the E.K.G. machine to work, and he continued to complain of being in severe pain with no relief from the Maalox.  *Id.* at 7-8.  At approximately 1:30 a.m., they were finally able to get an E.K.G. reading and Plaintiff was told to "go lay down in the infirmary."  *Id.* at 8.  Plaintiff asked to go to the hospital instead because of his severe pain, but he is again told to go lay down.  *Id.*  Plaintiff said he received "no treatment in the infirmary" and was in "great fear."  *Id.*  An ambulance was finally summoned and Plaintiff was taken to Tallahassee Memorial Hospital, but he alleged that he was not transported for 7 hours.  *Id.* at 6-8.  Plaintiff arrived at the hospital at "around 3:30 a.m."  *Id.*  Blood was drawn, treatment started, and within fifteen minutes, a nurse confirmed that Plaintiff "was having a heart attack."  *Id.* at 8.

Plaintiff was stabilized and scheduled for a heart catheterization the next morning.  ECF No. 12 at 9.  Following that procedure, he spent two days in the I.C.U. and two days in another room before being released from the hospital.  *Id.*  Plaintiff returned to Jefferson C.I. and stayed in the infirmary for another two weeks.  *Id.*  Plaintiff alleges that he "received no additional medications other than the current medications that he already receive[d]."  *Id.*  Dr. Pliskin told him that he would be sent to the "Lake Butler Medical Center"[2] to see a cardiologist.  *Id.*

After his examination by the cardiologist, Plaintiff was informed that his condition "would be treated ... with medicine."  *Id.* at 10.  Plaintiff contends that since his return to Jefferson C.I., he has not been provided with any new or different medications "for this new heart problem, just the same medicines [he] was already receiving."  *Id.*  Plaintiff also alleges that his condition has worsened and he is experiencing "fluid build up" along with shortness of breath, fatigue, weakness, a persistent cough, and sudden weight gain, all of which are the "classic signs of congest[ive] heart failure."  *Id.*

---

[2] The Regional Medical Center is located in Lake Butler and is a "hospital owned by the Florida Department of Corrections."  ECF No. 43 at 3, n.4.

As relief, Plaintiff seeks a declaratory judgment, injunctive relief, compensatory and punitive damages, as well as costs. *Id.* at 11.

**Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party must

then show[3] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th

---

[3] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Cir. 2003) (quoting <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of evidence" is not enough to refer the matter to a jury). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Hickson Corp.</u>, 357 F.3d at 1260 (quoting <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)). All "justifiable inferences" must be resolved in the light most favorable to the nonmoving party, <u>Beard</u>, 548 U.S. at 529, 126 S. Ct. at 2578 (noting the distinction "between evidence of disputed facts and

disputed matters of professional judgment."),[4] but "only if there is a

'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127

S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557

U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where

the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec.

Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

## Rule 56 Evidence[5]

Plaintiff is a prisoner in the custody of the Florida Department of

Corrections with a documented history of cardiovascular disease.  ECF No.

---

[4]  Noting that deference must be given "to the professional judgment of prison administrators," the Court stated that "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage."  Beard, 548 U.S. at 530, 126 S. Ct. at 2578 (citing Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 2167, 156 L. Ed. 2d 162 (2003)).

[5] Plaintiff filed a response to the summary judgment motion which contained copies of exhibits that Defendants already submitted (including medical records from the Hospital, ECF No. 81 at 41, 43-44), along with Defendants' responses to Plaintiff's interrogatories.  ECF No. 81 at 22-30; 71-105.  Plaintiff did not include his own affidavit or declaration in opposing summary judgment, and although Plaintiff's argument as to the events which transpired prior to being sent to the hospital is not "evidence" for purposes of Rule 56, his amended complaint was signed under penalty of perjury and constitutes a "declaration" pursuant to 28 U.S.C. § 1746.  Pavao v. Miles, No. 5:15-CV-68-RH-GRJ, 2016 WL 7007538, at *1 (N.D. Fla. July 29, 2016), report and recommendation adopted, No. 5:15CV68-RH/GRJ, 2016 WL 6988495 (N.D. Fla. Nov. 28, 2016) (complaint signed under penalty of perjury was treated like a sworn affidavit).

76-4 at 76.  Plaintiff has had four heart attacks and quadruple bypass surgery.  ECF No. 12 at 5; *see also* ECF No. 76-5 at 52.  In light of that history, Plaintiff has a prescription for "nitro tabs" which he kept in his cell, ECF No. 12 at 5, and which had been re-filed in May of 2014.  ECF No. 76-4 at 72.

Defendant Carrie Rhodes is a licensed practical nurse who was working at Jefferson Correctional Institution on August 8, 2014.  ECF No. 80-1 at 1. (Rhodes Affidavit).  Maria Thomas is a registered nurse who had "just started part-time work for Corizon Health, Inc."  ECF No. 78-1 at 1. (Thomas Affidavit).  She worked on an "as-needed basis" and, on August 8, 2014, was "in training and was following another registered nurse."  *Id.* at 2.  She states that she "was not allowed to provide patient treatment on [her] own."  *Id.*  Defendant Thomas also declares that she "had no interaction" with Plaintiff on August 8, 2014, and states that her shift began at midnight and ended at 8:30 a.m.  *Id.*

On August 8, 2014, Plaintiff was brought to the medical unit with complaints of chest pain.  ECF No. 80-1.  The physician[6] was contacted,

---

[6] The physician, Dr. Masa, "was on call when the events took place, not in the facility."  ECF No. 81 at 28.

and nitroglycerine and Maalox were ordered for Plaintiff.  *Id.* at 2.[7]  The medical records reveal that Plaintiff was given a first dose of nitroglycerine at approximately 9:40 p.m., and a second dose of nitroglycerine was given at 9:45 p.m. on August 8, 2014.  ECF No. 76-4 at 86.  The medical records show that Plaintiff was given Maalox at 10:00 p.m., and a second dose given at 11:40 p.m.  *Id.* at 82, 86.  A notation in Plaintiff's chronological record of health care for August 8, 2014, appears to have been entered by Defendant Rhodes.  *Id*. at 64.  The "chest pain protocol" form is also signed by Defendant Rhodes.  *Id.* at 60.

The medical records note that Plaintiff complained of shortness of breath and sharp pain in the chest which was radiating down his arms.  ECF No. 76-4 at 60, 82.  The emergency room record indicated that Plaintiff reported that his pain level went down from a 10 to a 5 after taking the medications.  *Id.* at 82.  However, the "Chest Pain Protocol" form stated Plaintiff reported his pain at a level of 8, but no boxes were checked which

---

[7] The motion for summary judgment asserts that Nurse Rhodes contacted the physician, got the medications which were ordered, and provided them to Plaintiff.  ECF No. 77 at 3.  The first medical record cited, ECF No. 76-4 at 60, does not indicate that she contacted the physician.  Other records indicate Dr. Masa was notified, but do not indicate actions taken by Nurse Rhodes, nor do the records contain her signature or stamp.  *Id.* at 82-86.

Case No. 4:16cv507-MW/CAS

would indicate Plaintiff complained of "severe chest pain," had abnormal vital signs, had a history of cardiac issues, or that he took "NTG tables" prior to coming to the medical unit.  *Id.* at 60; *see also* ECF No. 81 at 25 (Masa Interrogatories).[8]  That form, signed by Defendant Rhodes, does not include a notation that the physician was contacted, *id.*, although other "Emergency Room Record" forms signed by other medical staff, note that Dr. Masa was notified.  ECF No. 76-4 at 82, 84-86.  The medical records do not state when Dr. Masa was contacted or by whom.

The "diagram of injury" form noted that Plaintiff had no injury but complained of chest pain.  *Id.* at 83.  It was signed by Defendant Thomas, and shows a date of August 8, 2014, at 9:40 pm.  *Id.*  While acknowledging that the "staff signature" on that form "seems to" be her signature, Nurse Thomas states in her affidavit that if she "signed that document, it was in error, as the writing is not" hers.  *Id.*  ECF No. 78-1 at 4.  She also reiterates that she "did not begin work until midnight" at Jefferson C.I and that she "did not treat patients" on August 8, 2014, because she "was in training."  *Id.*

---

[8] The medical records refer to this person as Dr. Masa.  The signature on the interrogatories, however, indicates the surname may be Mesa.  ECF No. 81 at 30.

Defendant Rhodes declares that the "physician did not order an EKG" and she could not perform one without an order.[9]  *Id.* at 2.  She states that she cannot recall any instance when "the EKG machine at Jefferson malfunctioned or did not work."  *Id.*  She also states that Plaintiff's condition "was not emergent to the extent that he needed immediate transport to the hospital, as his condition improved with the ordered treatment."  *Id.*  Finally, Defendant Rhodes declares that her shift ended at 11 p.m. on August 8, 2014.  *Id.*

At some point during these events, Dr. Masa directed staff to send Plaintiff "to TMH via EMS due to" his complaints of chest pain and "abnormal EKG."  ECF No. 76-4 at 64.  Dr. Masa indicates that upon learning of Plaintiff's "chest pain, signs and symptoms, the patient was ordered to be sent to the emergency room immediately."  ECF No. 81 at 24.  It appears that Plaintiff was transferred at 2:25 a.m. on August 9, 2014, and the form shows he was in stable condition.  ECF No. 76-4 at 64, 82, 84-85.

---

[9] Plaintiff submitted Dr. Masa's response to his interrogatories which indicates that "[o]btaining an EKG is part of the [nursing] protocol."  ECF No. 81 at 29.  Plaintiff did not, however, submit a copy of the protocol.

A discharge summary report from Tallahassee Memorial Hospital [TMH] reveals Plaintiff had "a significant medical history of coronary artery disease, status post 4-vessel bypass in 2009."  ECF No. 76-5 at 52.  The record notes that Plaintiff arrived in the ER at TMH "with complaints of severe chest pain 9/10, starting at rest while he was shaving . . . ."  *Id.*  In addition to the pain which radiated down his arms and cervical spine, Plaintiff reported "associated symptoms of nausea, diaphoresis and weakness."  *Id.*  Plaintiff was admitted to the ICU and examined by a cardiologist.  *Id.* at 53.  A cardiac "catheterization revealed one occluded saphenous vein graft and and [sic] remaining 3/4 grafts patent."  *Id.*[10] "Cardiology recommended medical management for occluded graft and" Plaintiff was released from ICU to the cardiac floor.  *Id.*  An echocardiogram showed "EF 50-55% with stage I diastolic dysfunction."  *Id.* Following his heart attack and heart cath, Plaintiff returned from the hospital on August 11, 2014, and was admitted to the Infirmary for observation.  ECF No. 76-4 at 63, 64.  Plaintiff received follow-up care for

---

[10] The cardiac catheterization report showed a "left anterior descending is 100% occluded in the proximal portion."  ECF No. 76-5 at 58.  Plaintiff had two blocked vein grafts.  ECF No. 76-5 at 4; ECF No. 81 at 46.

his cardiac issues, ECF No. 76-4 at 51-53, and his subsequent care is not part of his claims against the Defendants.

**Analysis**

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison.  Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  The Eighth Amendment guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoted in Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)).  "[B]asic human necessities include food, clothing, shelter, sanitation, medical care, and personal safety."  Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991) (cited in Collins v. Homestead Corr. Inst., 452 F.App'x 848, 850-851 (11th Cir. 2011)).

Deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). "To prove a claim for deliberate indifference under the Eighth Amendment, a prisoner must show (1) that he had an objectively serious medical need

Case No. 4:16cv507-MW/CAS

and (2) that the prison official subjectively acted with deliberate indifference to that need."  Carter v. Broward Cty. Sheriff Office, 710 F. App'x 387, 391 (11th Cir. 2017) (citing Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow, 320 F.3d at 1243 (quotations omitted) (quoted in Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011)).  "In either of these situations, the medical need must be 'one that, if left unattended, 'pos[es] a substantial risk of serious harm.'"  Farrow, 320 F.3d at 1243 (citation omitted); *see also* Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009).  Additionally, a "serious medical need" may be determined by whether a delay in treating the need worsens the condition" or "if left unattended, poses a substantial risk of serious harm."  Mann, 588 F.3d at 1307 (11th Cir. 2009) (citations omitted).  "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the

medical need is relevant in determining what type of delay is constitutionally intolerable." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (citing Harris v. Coweta Cnty., 21 F.3d 388, 393-94 (11th Cir. 1994); Brown v. Hughes, 894 F.2d 1533, 1537-39 (11th Cir. 1990)).

In this case, Defendants argue that "there is no medical information that [Plaintiff] had a serious medical need, a heart attack, at any time before he was transferred to the hospital by a different nurse on order of the physician." ECF No. 77 at 10. They assert that the record does not show Plaintiff had "a serious medical need that went unaddressed by the Defendants." Id.

It would appear that Defendants contend Plaintiff did not have a serious medical need. That argument is rejected. A heart attack is an "objectively serious medical need." Carter, 710 F. App'x at 388, 391 (vacating sua sponte dismissal of prisoner's claim that defendants were deliberately indifferent to his needs after he "experienced severe chest pains and shortness of breath" and was diagnosed with a "slight heart attack" after electrocardiogram (EKG) was performed, which was a "serious medical need"). Plaintiff had a history of cardiac issues, a prescription for nitroglycerin pills, and reported to medical with complaints of extreme chest

pain radiating down his arms, and shortness of breath.  It would be obvious even to a lay person that Plaintiff had a serious medical need.

After showing a serious medical need, a plaintiff must show deliberate indifference by the Defendants.  Deliberate indifference requires more than negligence,[11] but it is unnecessary to show a defendant intended to cause harm.  Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994).  "Deliberate indifference has three components the plaintiff must satisfy: he must show a prison official's '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.'"  Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (internal quotation marks omitted) (quoted in Carter, 710 F. App'x at 391).  "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all."  Carter, 710 F. App'x at 391 (quoting Bingham).  "A prison official 'who delays necessary treatment for

---

[11] "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all."  Bingham, 654 F.3d at 1176 (citing Brown v. Johnson, 387 F.3d 1344, 1451 (11th Cir. 2004)).

non-medical reasons may exhibit deliberate indifference." *Id.*  Furthermore,

in cases alleging "delay in treatment," "even when treatment is ultimately

provided, deliberate indifference may be 'inferred from an unexplained

delay in treating a known or obvious serious medical condition.'"  Harris v.

Coweta Cnty., 21 F.3d 388, 394 (11th Cir. 1994) (quoted in Hairston v.

Negron, 557 F. App'x 884, 891 (11th Cir. 2014)).

As to the first element, "a factfinder may conclude that a prison

official knew of a substantial risk from the very fact that the risk was

obvious."  Farmer, 511 U.S. at 842, 114 S. Ct. at 1981.  In the case of a

suspected heart attack, the Defendant nurses must be deemed to know

that Plaintiff faced a substantial risk of harm, including death, if treatment

was not promptly provided.

The remaining question is whether Defendants disregarded that risk

"by conduct that is more than mere negligence."  Bingham, 654 F.3d 1171.

Defendant Thomas contends that she "had nothing to do with" Plaintiff

because she was "in training and had no responsibilities."  ECF No. 77 at

10.  Defendant Thomas also asserted that her shift was from midnight to

8:30 a.m., suggesting that she was uninvolved.  However, Plaintiff

contends that she was there and participated in trying to get the EKG

Case No. 4:16cv507-MW/CAS

machine to work.  Plaintiff points to the "diagram of injury" form as showing

that she was there at 9:40 p.m.  *See* ECF No. 76-4 at 83.  Plaintiff asserts

that she, and Defendant Rhodes, dismissed his complaints that he knew he

was having a heart attack because he already had four prior attacks, and

began treating him as though he just had gas pain.  ECF No. 12 at 7.

Plaintiff states that the nurses tried unsuccessfully "for hours" to get the

EKG to work instead of having him transported to the hospital.  *Id.* at 7-8.

Plaintiff's version of the events is that the nurses provided essentially "no

treatment" and told him to just lie down in the infirmary until an EKG was

finally successful at "around 1:30 a.m."  *Id.* at 8.  At that point, he is

transported to TMH where it is confirmed that he is having a heart attack.

There is a genuine dispute of material fact as to whether Defendant

Thomas was deliberately indifferent to Plaintiff's medical needs.  The

justifiable inference which must be resolved in the light most favorable to

Plaintiff is that Defendant Thomas was present during these events, either

on August 8th before midnight, or on August 9th after midnight, as she

signed one of Plaintiff's medical forms.  A jury could find that by taking no

steps to render medical care to Plaintiff, even while "in training" at the

institution, as a nurse, she was deliberately indifferent to the medical needs

Case No. 4:16cv507-MW/CAS

of a prisoner who was suspected of having a heart attack.  Summary

judgment should be denied as to Defendant Thomas.

Defendant Rhodes argued that she contacted the physician, received

orders, and gave Plaintiff medication.  She contends that she did not

receive an order for an EKG before her shift ended at 11:00 p.m. and there

was no "emergent need" for Plaintiff to go to the hospital.  Plaintiff, on the

other hand, contends she was there longer than 11:00 p.m. because the

medical record shows she gave him Maalox at 11:40 p.m.  *See* ECF No.

76-4 at 82.  Viewing the evidence in the light most favorable to Plaintiff, that

assertion is accepted, notwithstanding that the medical record does not

provide certainty as to *who* gave Plaintiff the Maalox.  Defendant Rhodes'

own affidavit does not clearly assert that *she* provided the ordered

medications to Plaintiff so much as it does demonstrate *what* he was given.

ECF No. 80-1 at 2.  Furthermore, the evidence shows that Plaintiff was

given nitroglycerine, but little else was done for hours.  Plaintiff disputes

that he arrived in the medical unit at approximately 9:40 p.m. as stated by

Defendants.  Instead, he asserts that he went to medical as early as 7:30

p.m.  ECF No. 12 at 7.  It cannot be accepted that Plaintiff was given

appropriate and timely medical care when there is no evidence that he was given any medical care beyond nitroglycerine and Maalox.

Plaintiff also argues that Defendant Rhodes spent hours attempting to get the EKG machine to work, contradicting Defendant Rhodes' testimony.  Moreover, while the evidence reveals an EKG was ultimately taken, the absence of any evidence showing *when* the EKG was ordered is suspect.  The medical record indicates Plaintiff arrived in the institution's "emergency room," and then notes that he should be taken by EMS to TMH due to the abnormal EKG.  Missing is any notation as to when that EKG was ordered and when it was taken.  There is a genuine dispute of material fact as to whether Defendant Rhodes was deliberately indifferent to Plaintiff's medical needs.

Caselaw establishes that "an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." McElligott, 182 F.3d at 1255 (citing Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir.1997); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir.1989)).  There is a genuine dispute of material fact as to whether these

Defendants failed to provide medical treatment for the Plaintiff.  Summary judgment cannot be granted in Defendants' favor.

**Plaintiff's motion, ECF No. 87**

Plaintiff submitted a letter which has been docketed as a motion for urgent medical attention.  ECF No. 87.  Plaintiff asserts that a "sick call nurse" and Doctor Robinson have refused to refill his "vital medications." He contends that his grievances have not provided him with any relief and he needs his "heart medications" as well as cholesterol and blood pressure medications.  *Id.*  These issues are not taken lightly, but there is no showing in Plaintiff's motion that the Defendants in this case are involved in these recent events.  The motion must be denied because it is unrelated to Defendants' actions and Plaintiff is now located at Columbia C.I.

**RECOMMENDATION**

It is respectfully **RECOMMENDED** that the Defendants' motion for summary judgment, ECF No. 77, be **DENIED** because there is a genuine

dispute of material fact, that Plaintiff's motion, ECF No. 87, be **DENIED**,

and this case be **REMANDED** for further proceedings.

IN CHAMBERS at Tallahassee, Florida, on March 14, 2019.


S/     Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.

Case No. 4:16cv507-MW/CAS